Brett Schreiber (SBN 239707)
bschreiber@singletonschreiber.com
Meagan Verschueren (SBN 313117)
mverschueren@singletonschreiber.com
Katie Llamas (SBN 303983)
kllamas@singletonschreiber.com
SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Ste. 1025
San Diego, CA 92108
Tel. (619) 771-3473

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT,
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE 1, an individual, and JANE DOE 2, a minor, by and through her guardian JANE DOE 1,<br><br>Plaintiff,<br><br>v.<br><br>G6 Hospitality, LLC; G6 Hospitality IP, LLC; G6 Hospitality Property, LLC; G6 Hospitality Purchasing, LLC; G6 Hospitality Franchising, LLC; Motel 6 Operating, LP; D Mod Hotel LLC.; Tridevi Corporation; and DOES 1-100, inclusive,<br><br>Defendants. | No.  2:25-cv-03142-DC-JDP<br><br>**PLAINTIFFS' SECOND AMENDED COMPLAINT** |

1

**SECOND AMENDED COMPLAINT**

COMES NOW, the Plaintiffs JANE DOE 1 and JANE DOE 2, by and through the undersigned counsel, and respectfully submits this Second Amended Complaint for damages and makes the following averments.

**INTRODUCTION**

1.      Jane Doe 1 and Jane Doe 2 bring this action to hold Defendants accountable for facilitating and knowingly profiting from Jane Doe 1's sex trafficking, which caused serious and permanent injuries to Jane Doe 1 and Jane Doe 2 . Plaintiffs demand justice and compensation for the profound harms and losses Jane Doe 1 endured at Defendants' properties from 2018 through 2020 and the permanent debilitating harm caused to Jane Doe 2.

2.      One of Jane Doe 1's permanent and most profound losses is her daughter's Jane Doe 2's cerebral palsy diagnosis. Jane Doe 1's trafficker forced her to perform commercial sex acts on Defendants' properties throughout her *entire* pregnancy up until she gave birth to her daughter Jane Doe 2 in 2020. The physical violence Jane Doe 1 endured during her trafficking caused Jane Doe 2 cerebral palsy with quadriplegia.

3.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq. has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

4.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who while not criminally liable under the TVPRA, financially benefit from participation in a venture that they know or should have known engaged in criminal sex trafficking.

5.      For years, sex trafficking ventures have brazenly operated in and out of hotels throughout the United States and especially at Motel 6 and Studio 6 locations.

6. Major hotel brands, including Defendants, have made public claims about combating human trafficking, while at the same time expanding their economy hotels where sex trafficking is most prevalent and profiting from crimes that are perpetrated on their properties and from providing harbor for the underlying assaults. Time after time, Motel 6 has scouted and chosen properties on "blades" and areas specifically known for

prostitution, crime and sex trafficking.

7. The hotel and hospitality industry continue to create and expand the environment for traffickers to harbor victims and neglect taking reasonable steps to prevent such criminal misconduct, instead choosing to earn a profit at the expense of human life, human rights, and human dignity.

8. Appearances and sponsorships do not excuse corporations and individuals that have financially benefited from sex trafficking, including G6 entities and Motel 6 companies. In fact, it reveals corporate knowledge of the use of their properties and technology as hubs for human trafficking. The hotel industry has provided the means, environment, and support for the human trafficking industry to become the second largest profitable criminal activity in the United States.[1] They speak about ending it, but their actions intentionally promote it as they continue to profit from it every single day.

9. As the trafficking industry grows, so have Defendants and their profits through the expansion of their properties and rooms rented for this explicit and apparent purpose.

10. At some locations, Motel 6 past live-in managers estimate that up to 90% of their business and profits were directly tied to trafficking. Managers and past employees allege the sex trafficking was reported up the chain to corporate (Defendants) and they were encouraged to look the other way. Corporate did

---

[1] Human trafficking is now the SECOND MOST PROFITABLE CRIMINAL ACTIVITY in the United States! - Monique Burr Foundation

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

nothing to prevent or stop it.

11.    Jane Doe 1 endured sex trafficking in motels owned, operated, maintained, and controlled by Defendants, their agents and staff.

12.    Jane Doe 1 was subjected to unimaginable atrocities including but not limited to repeated daily rape, verbal and physical attacks, humiliation, fear, and psychological manipulation and degradation, including while pregnant which ultimately led to her daughter Jane Doe 2's devastating long-term health complications.

13.    Defendants continued supporting traffickers, including Jane Doe 1's trafficker, despite evident and apparent signs of ongoing sex trafficking, and of Jane Doe 1 being trafficked, at its motels and specifically the following Motel 6 locations:

    a. Motel 6, 1433 Calle Joaquin, San Luis Obispo, CA 93405

    b. Motel 6, 1920 W Orangeburg Ave, Modesto, CA 95350

    c. Motel 6, 1250 Twin View Blvd, Redding, CA 96003

    d. Motel 6, 250 S Walnut Rd, Turlock, CA 95380

    e. Motel 6, 150 Northwoods Ave. Manteca, CA 95336

14.    The Defendants benefited financially by allowing their motels, managers and employees to facilitate and support the trafficking of Jane Doe 1. Defendants strategically provided venues where traffickers could exploit victims like Jane Doe 1 with minimal risk of detection and interruption so that Defendants could continue to profit from regular room rentals.  As a result of sex trafficking, Defendants thrive.  To them, it's a well-thought-out business decision.  To Jane Doe 1 and her daughter, it a nightmare that they will never wake up from.  Defendants destroyed their lives.

15.    Jane Doe 1 files this civil lawsuit seeking full justice for the harm she suffered as a result of being sex trafficked and sold for sex at hotels owned, operated, maintained, regulated, and controlled by Defendants and their agents and staff. Defendants knowingly participated in atrocities so insurmountable, so

4

indescribable, it defies comprehension—an anguish no woman, no parent and no human should ever be condemned to face.

### PARTIES

16.     Jane Doe 1 is a natural person who is currently a resident and citizen of California. Jane Doe 1 is a survivor of sex trafficking. From approximately July 2018 to August 2020, she was harbored, forced and coerced to engage in commercial sex acts for the benefit of her trafficker and Defendants.

    a. Due to the sensitive, private, and potentially retaliatory nature of these allegations, this Complaint identifies Jane Doe 1 by a pseudonym only. Jane Doe 1 will move the Court to proceed under a pseudonym in all filings, all public Court proceedings, and to limit the disclosure of information about Jane Doe 1's true identity in order to protect Jane Doe 1 and Jane Doe 1's identity.

    b. Generally, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved may result in retaliation or harm to the Jane Doe 1.[3] For good cause, the Court may issue an order to protect a party or person from undue harms and burdens.

    c. In order to maintain her and her child's privacy and safety, Jane Doe 1 should not be compelled to disclose her identity. Jane Doe 1's privacy interest substantially outweighs the customary practice of judicial openness.[4] Jane Doe 1 and her daughter's life could be put in grave danger should her trafficker or his associates learn information about her through publicly filed documents in this action and if they find out she has spoken out about the trafficking.

---

[2] Fed. R. Civ. P. 10(a).
[3] See Cases e.g., *Doe v. Penzato*, 2011 U.S. Dist. LEXIS 51681, *6-9 (N.D. Cal. May 13, 2011); *Roe v. St. Louis Univ.*, 2009 U.S. Dist. LEXIS 27716, *13, (E.D. Mo. Apr. 2, 2009)
[4] See case *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (internal citation and quotations omitted).

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

d. Defendants will not be prejudiced. Jane Doe 1 will agree to reveal her identity to Defendants for the limited purpose of investigating Jane Doe 1's claims once the parties have entered into a protective order.

e. Jane Doe 1 simply seeks redaction of her personally identifying information from the public docket and assurances that Defendants will not use or publish Jane Doe 1's identities in a manner that will compromise her personal life, future safety, family's safety, or employment prospects, as well as her rights to privacy after being a victim of multiple sex abuses, physical violence, and sexual assaults.

17.    Jane Doe 2 is a natural person who is currently a resident and citizen of California and the minor biological daughter of Jane Doe 1. Jane Doe 2 was born prematurely in August 2020 and was diagnosed with cerebral palsy shortly thereafter. Throughout 2020, Jane Doe 1 was trafficked, brutally raped and assaulted, and she and Jane Doe 2 were subjected to physical violence at Defendants' hotels while Jane Doe 1 was pregnant with Jane Doe 2.

a. Due to the sensitive, private, and potentially retaliatory nature of these allegations and because Jane Doe 2 is a minor, this Complaint identifies Jane Doe 2 by a pseudonym only. Jane Doe 2 will move the Court to proceed under a pseudonym in all filings, all public Court proceedings, and to limit the disclosure of information about Jane Doe 1's true identity in order to protect Jane Doe 1 and Jane Doe 1's identity.

b. Generally, pleadings must state the name of all parties.[5] However, there are exceptions when the issues involved may result in

---

[5] Fed. R. Civ. P. 10(a).

6

retaliation or harm to the Jane Doe 1.[6] For good cause, the Court may issue an order to protect a party or person from undue harms and burdens.

    c.  In order to maintain her privacy and safety, Jane Doe 1 should not be compelled to disclose her identity. Jane Doe 1's privacy interest substantially outweighs the customary practice of judicial openness.[7]  Jane Doe 2's life could be put in grave danger should her trafficker or his associates learn information about her through publicly filed documents in this action and if they find out she has spoken out about the trafficking.

    d.  Defendants will not be prejudiced. Jane Doe 2 will agree to reveal her identity to Defendants for the limited purpose of investigating Jane Doe 2's claims once the parties have entered into a protective order.

    e.  Jane Doe 1 simply seeks redaction of Jane Doe 2's personally identifying information from the public docket and assurances that Defendants will not use or publish Jane Doe 2's identities in a manner that will compromise her personal life, future safety, family's safety, or employment prospects, as well as her rights to privacy as a minor.

18.    Defendant D Mod Hotel, LLC is a for-profit California limited liability company with its principal place of business in Frisco, Texas. Defendant D Mod Hotel, LLC owned, operated, managed, maintained, inspected, secured, supervised, and/or controlled Motel 6 located at 1920 W. Orangeburg Ave. Modesto, CA 95350 from 2019 through 2020 while Jane Doe 1 was trafficked there.

///

---

[6] See Cases e.g., *Doe v. Penzato*, 2011 U.S. Dist. LEXIS 51681, *6-9 (N.D. Cal. May 13, 2011); *Roe v. St. Louis Univ.*, 2009 U.S. Dist. LEXIS 27716, *13, (E.D. Mo. Apr. 2, 2009)

[7] See case *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (internal citation and quotations omitted).

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

19.     Defendant TRIDEVI CORPORATION is a corporation in California conducting business in Riverside County, California. Defendant TRIDEVI CORPORATION, owned, operated, managed, maintained, inspected, secured, supervised, and/or controlled Motel 6, located at 150 Northwoods Ave. Manteca, CA 95336 from 2018 through 2020 while Jane Doe 1 was trafficked there.

20.     Defendants D Mod Hotel, LLC and TRIDEVI CORPORATION will collectively be referred to as, "Motel 6 Location Defendants."

21.     Defendant G6 Hospitality, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

22.     Defendant G6 Hospitality, IP, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

23.     Defendant G6 Hospitality Property, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

24.     Defendant G6 Hospitality Purchasing, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

25.     Defendant G6 Hospitality Franchising, LLC., is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

26.     Defendant Motel 6 Operating, LP., is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

27.     Defendants G6 Hospitality, LLC, G6 Hospitality IP, LLC; G6 Hospitality Property, LLC.; G6 Hospitality Purchasing, LLC.; G6 Hospitality Franchising, LLC.; Motel 6 Operating, LP., will collectively be referred to as "G6 Defendants."

28.     G6 Defendants are registered to do business in the State of California and may be served at 1325 J Street, Suite 1550 Sacramento, California.

29.     At all relevant times, G6 Defendants owned, operated, managed, maintained, inspected, secured, supervised, and controlled the following locations; and transacted business in the State of California and purposefully availed itself to

8

the State of California through its operation, control and ownership of the following Motel 6 locations:

      a.  Motel 6, located at 1433 Calle Joaquin, San Luis Obispo, CA 93405

      b.  Motel 6, located at 1920 W Orangeburg Ave, Modesto, CA 95350

      c.  Motel 6, located at 1250 Twin View Blvd, Redding, CA 96003

      d.  Motel 6, located at 250 S Walnut Rd, Turlock, CA 95380

      e.  Motel 6, located at 150 Northwoods Ave. Manteca, CA 95336

30.    Whenever reference is made in this Complaint to any act, deed, or conduct of the Motel 6 Location Defendants, the allegation is that the Motel 6 Location Defendants engaged in the act, deed or conduct by or through one or more of their officers, directors, agents, staff, or representatives who was actively engaged in the management, direction,

control, or transaction of the ordinary business and affairs of the G6 Defendants.

31.    Whenever reference is made in this Complaint to any act, deed, or conduct of the G6 Defendants, the allegations is that the G6 Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, staff, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the G6 Defendants and the Motel 6 Location Defendants.

## JURISDICTION AND VENUE

32.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Reauthorization Act ("TVPRA").

33.    Venue is proper in this court pursuant to 28 U.S.C § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendant's misconduct and omissions, led to injuries that occurred in the judicial district where this action is brought.

///

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

34.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of Modesto County, California, and all Defendants are registered to do business in California.

35.     Upon information and belief, the "Motel 6 Location Defendants," and the "G6 Defendants," transacted business in the Counties of each Motel 6 at issue in this case throughout California, and purposefully availed themselves to the Counties within the Eastern District of California's jurisdiction, and the citizens of California through the subject hotel locations.

## SEX TRAFFICKING UNDER FEDERAL LAW

36.     Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[8]

37.     The requirements for liability under the TVPRA on a beneficiary theory can be stated as follows: (1) the person or entity "knowingly benefits, financially or by receiving anything of value" (2) "from participating in a venture" (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

38.     "Sex trafficking" is defined by the TVPRA under 22 U.S.C. § 7102(12) as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act."

39.     The term "severe forms of trafficking in persons" includes "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age." 22 U.S.C. § 7102(11).

///

---

[8] 18 U.S.C. §1591; 22 U.S.C. § 7102.

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

# FACTUAL ALLEGATIONS

## The Hospitality Industry Aids and Abets Sex Traffickers

40.     The Defendants' knowledge and notice is not limited to the specific red flags that Jane Doe 1 exhibited at the subject hotel locations in the presence of the staff. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Defendant's knew or should have known regarding the trafficking at their subject hotel locations, including the trafficking of Jane Doe 1. The hospitality industry has been aiding and abetting sex trafficking for decades.

41.     Hotels are the primary place where sex trafficking happens.[9] For years, sex traffickers have "been able to reap their profits with little risk when attempting to operate within hotels."[10] According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur. In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels."[11] Traffickers and buyers alike frequently use hotel rooms to exploit victims.

42.     In 2017, human trafficking was noted as the world's fastest growing crime.[12] While the term "human trafficking" incorporates all forced labor, the sex trafficking industry alone brings in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of all illegal drugs.[13]

///

---

[9] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's also Big Business*, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/

[10] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10 2016), https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/

[11] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hotel Industry, Cornell Hotel Report (Oct. 2015),

[12] Human Trafficking is the World's Fastest Growing Crime. May 22, 2017. The Advisory Board. Available at: https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking

[13] Profits and Poverty: The Economics of Forced Labor. May 24, 2014. International Labor Organization. Available at: http://www.ilo.org/global/publications/ilo-bookstore/orderonline/books/WCMS_243391/lang--en/index htm.

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

43.     The hospitality industry plays a crucial role in the sex trade.[14] Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Despite the known risks and known trafficking crimes, Hotels, including the Defendants, offer anonymity and non-traceability to the traffickers, making them ideal venues for crime and sex trafficking in particular.  Hotels, including the Defendants, knowingly harbor traffickers, buyers, and victims.

44.     According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.  Traffickers and buyers alike frequently use hotel rooms to exploit victims.

45.     Due to the overall hospitality industry's complacency, complicity, and reckless disregard in addressing the known issue of sex trafficking, hotels are the venue of choice for sex trafficking.  Traffickers and buyers capitalize on the hotel industry's general refusal to (1) adopt and enforce companywide anti-trafficking policies from the corporate to the property level, (2) train staff on what to look for and how to respond, and/or (3) establish
safe and secure reporting mechanisms for those at the point of sale.

46.     Every day, thousands of hotel staff witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

47.     Hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation and should be held accountable when they fail to comply. As stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent

---

[14] Cavagnaro, Giovanna L. C. 2017. Sex Trafficking: The Hospitality Industry's Role and Responsibility. Cornell University School of Hotel Administration. Available at: http://scholarship.sha.cornell.edu/honorstheses/3.

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

responsibility to deter the crime and can be liable for failing to do so."

48.     Even estimates by attorneys for the hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[15] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.

49.     The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex trafficking ventures move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Traffickers are well aware of the seclusion and anonymity attendant with booking rooms with certain hotel chains, including the Hotel chain named in this complaint — they know it is unlikely that they will be disturbed.

50.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

51.     The most effective weapon against sexual exploitation and human trafficking is education and training.[16] As PACT concluded:

> *Due to the anonymous, risk-free nature of the hospitality industry, children across the globe are exploited in hotels—ranging from budget properties to luxury resorts. Hotel associates are uniquely situated to identify and report suspicious activity. From check-in to check-out there are a number of indicators victims and traffickers exhibit during the time they are on a hotel property. With proper*

---

[15] U.S. Dep't of State. 2016. 2016 Trafficking in Persons Report, at 387. Available at: https://www.state.gov/documents/organization/258876.pdf.

[16] Polaris Project, *Recognizing Human trafficking*, https://polarisproject.org/recognizing-human-trafficking/

13

*training, a front desk agent or a housekeeper can notice that something is not right and respond.*[17]

52.    There are abundant free resources available to the hotel industry that provide effective trafficking recognition and response training. Every hotel – large and small, luxury and modest, urban and rural – has the resources to implement a viable anti-trafficking program.

53.    Multiple agencies have established recommended policies and procedure for recognizing the signs of sex trafficking. Each of the following organizations offers guidance and recommendations for viable programs in this context:

   a.  The United States Department of Homeland Security – DHS Blue Campaign
   b.  The National Center for Missing and Exploited Children
   c.  The Polaris Project
   d.  The Texas Attorney General
   e.  Love 146
   f.  Protect All Children from Trafficking - PACT
   g.  United Nations Universal Declaration of Human Rights
   h.  United Nations Global Compact
   i.  United Nations Guiding Principles on Business and Human Rights
   j.  The Code – The Tourism Child Protection Code of Conduct
   k.  National Human Trafficking Resource Center and Hotline
   l.  HHS/ACF Look Beneath the Surface
   m. Businesses Ending Slavery and Trafficking - BEST
   n.  Sustainable Hospitality Alliance Trafficking Recommendations
   o.  American Hotel Lodging Association Trafficking Recommendations

///

---

[17] PACT USA, *Hotel Training for Associates and Managers*, https://courses.wearepact.org/hotel-training

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

54.    The leading federal agency in this area is The United States Department of Homeland Security (DHS) Blue Campaign. The Blue Campaign is the unified voice for the U.S. Department of Homeland Security's efforts to combat human trafficking. Working with law enforcement, government and non-governmental and private organizations, the Blue Campaign strives to protect the basic right of freedom and bring those who exploit human lives to justice.[18]

55.    The Blue Campaign recognizes that traffickers have long used the hotel industry for sex trafficking and offers resources for the industry, including an essential list of actions these businesses can take to help stop human trafficking.

56.    The Blue Campaign has produced lists of warning signs of human for members of the hotel industry. The DHS remarked "Hotel and hotel staff are often in the best position to see potential signs of human trafficking, especially since your duties give you access to different areas of the properties. You may also have direct or indirect contact with both traffickers and victims."[19] Sex trafficking "red flags" applicable to this lawsuit are described below. The compendium of "red flags" is available as part of the Blue Campaign Hospitality Toolkit. [20]

57.    The Blue Campaign provides specific "signs of human trafficking for housekeeping, maintenance, and room service staff.[21] According to the Blue Campaign: "Housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent. By being conscious of human trafficking indicators, you can help identify possible human trafficking activities and victims."

58.    There is a distinct list of "red flags" that pertain specifically to "concierge, bellman, front desk, security, and valet staff." These staff are typically the first to see guests when they enter the hotel and should be trained to detect

---

[18] https://www.dhs.gov/blue-campaign

[19] *Id*; *see also* Indicators of Human Trafficking, https://www.dhs.gov/blue-campaign/indicators-human-trafficking

[20] Blue Campaign. One Voice. One Mission. End Human Trafficking. Hospitality Toolkit. https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

[21] *Id.*

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

signs of potential trafficking."[22]

59.   There is yet an additional category dedicated to providing signs of human trafficking for "food and beverage staff" in the hospitality industry.

60.   Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking in the hospitality industry, which Defendants were aware or should have been aware of at all subject times of the trafficking alleged herein include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;
- Individuals show signs of physical abuse, restraint, and/or confinement;
- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;
- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;
- Individuals lack freedom of movement or are constantly monitored;
- Individuals avoid eye contact and interaction with others;
- Individuals have no control over or possession of money or ID;
- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;
- Individuals have few or no personal items—such as no luggage or other bags;
- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;
- A group of girls appears to be traveling with an older female or

---

[22] *Id.*

16

2:25-cv-03142-DC-JDP

male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;
- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;
- Possession and presence of bulk sexual paraphernalia such as condoms or lubricant;
- Possession or use of multiple cell phones;
- Possession or use of large amounts of cash or pre-paid cards;
- "Do Not Disturb" sign used constantly;
- Requests room or housekeeping services (additional towels, new linens, etc.), but denies hotel/hotel staff entry into room;
- Refusal of cleaning services for multiple days;
- Excessive amounts of cash in a room;
- Smell of bodily fluids and musk;
- Presence of multiple computers, cell phones, pagers, credit card swipes, or other technology;
- The same person reserving multiple rooms;
- Individuals leaving the room infrequently, not at all, or at odd hours;
- Individuals loitering in hallways or appearing to monitor the area;
- Excessive amounts of alcohol or illegal drugs in rooms;
- Evidence of pornography;
- Excessive number of people staying in a room;
- Extended stay with few or no personal possessions;
- Provocative clothing and shoes;
- Constant flow of men into a room at all hours;

17

- Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);
- Patrons checking into room appear distressed or injured;
- Room paid for with cash or pre-loaded credit card;
- Excessive use of hotel computers for adult oriented or sexually explicit websites;
- Patrons not forthcoming about full names, home address or vehicle information when registering;
- Individuals dropped off at the hotel or visited repeatedly over a period of time;
- Individuals checking into room have no identification;
- Room is rented hourly, less than a day, or for long term stay that does not appear normal;
- Patrons request information or access to adult services or sex industry;
- Room rented has fewer beds than patrons;
- Individuals enter/exit through the side or rear entrances, instead of the lobby;
- Car in parking lot regularly parked backward, so the license plate is not visible;
- Individuals asking staff or patrons for food or money.

61. The above policies and warning signs are designed to reduce sex trafficking. These "red flags" compose the standard of what hotels must look out for and know to look out for, and all of which have been known to the hospitality industry and G6 Defendants and the people behind the G6 Defendants' companies since long before 2018.

///

///

18

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

62.    The Department of Homeland security urges businesses – such as the subject hotels and hotel chains – to utilize the free educational services offered by the Blue Campaign to help identify victims of human trafficking by raising awareness and encouraging the public to report instances of human trafficking.[23]

63.    Federal government agencies also publish extensive tools for responding to suspected sex trafficking. One compendium is the United States Department of Health and Human Services "Identifying Victims of Human Trafficking – Fact Sheet."[24] This document acknowledges that responding to sex trafficking requires affirmative action: "It is important to be vigilant and to 'look beneath the surface' in situations that don't seem quite right. One chance encounter could be a victim's best hope for rescue."[25]

64.    It is widely recognized that effective training has a substantial, positive impact on the prevalence and scope of trafficking.[26] According to the American Hotel

Lodging Association: "Hotel staff who have undergone training are more aware of trafficking when it happens and are more willing to report it – than those who have not been trained."[27]

65.    Thus, when hotels implement viable anti-trafficking measures, provide proper training, and enforce anti-trafficking policies, trafficking is less likely to occur, and victims are more likely to be rescued.

66.    Conversely, when training is not provided and when anti-trafficking policies are not enforced, hotels and their staff are much more likely to participate in and facilitate the trafficking of victims like Jane Doe 1.

///

---

[23] https://www.dhs.gov/blue-campaign

[24] United States Department of Health and Human Services , Fact Sheet: Identifying Victims of Human Trafficking, https://acf.gov/sites/default/files/documents/orr/fact_sheet_identifying_victims_of_human_trafficking.pdf

[25] *Id*.

[26] Emily Roman, "Evaluating the Impact of Training Staff to Identify Victims of Human Trafficking" (2019). Digital Commons @ ACU, Electronic Theses and Dissertations. Paper 152, https://core.ac.uk/download/212874317.pdf

[27] American Hotel Lodging Association, No Room for Trafficking, https://www.ahlafoundation.org/nrft/

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

///

67.    From the top, major hotel brands like Motel 6, including all of the G6 Defendants and the people behind each company, know that sex trafficking is occurring at their properties and they are getting consistent reports from their employees regarding the same.  Unfortunately, instead of taking expedient, specific and zero-tolerance action and policies to stop and prevent it, Motel 6 companies have merely treated it as a cost/benefit analysis in terms of how likely they were to get sued or held accountable versus the profits it was generating. Until recently, lawsuits were not being filed, and they were not being held accountable. Now, through this lawsuit, Jane Doe 1 intends to hold them fully accountable and to make sex trafficking an unprofitable venture for Defendants to participate in.

68.    To be truly effective, human trafficking training should be part of an ongoing education and communication program to provide hotel staff with the knowledge and support they need to ensure a safe environment for all staff and guests.[28]

69.    The relationship between a pimp and prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in "prostitution," also known as "commercial sex," are subject to force, fraud, and/or coercion. It is also well understood that "prostitution" and "sex trafficking" involve a common denominator: the exchange of sex for money that goes to a controlling abuser/captor.

70.    Every day, thousands of hotel staff witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

///

---

[28] Five Ways Human Trafficking Training Can Help Hotels Increase Awareness and Prevention (2020), https://hospitalitytech.com/five-ways-human-trafficking-training-can-help-hotels-increase-awareness-and-prevention

///

71.    At all relevant times, there were long-standing, well known, viable standards of conduct and corporate operations available to the hotel industry to combat, prevent, and end sex trafficking at their properties.

72.    At all times of trafficking alleged herein, Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Defendants knew or should have known that signs of commercial sex activity, in combination with any other red flags, in their hotels were in fact signs of sex trafficking and should have and did see signs of the sex trafficking of Jane Doe 1 Jane Doe 1 that were observable by Defendants.

73.    Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their motel properties, including the subject properties, when enacting and enforcing policies and procedures applicable to those motels and when training, educating, and supervising the staff of each motel.

74.    Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel staff can identify and respond to sex and labor trafficking, it has become apparent that the decision of Defendants to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its motels—or in the face of actual knowledge that its happening—is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

**G6 Defendants Control the Motel 6 Location Defendants and franchised Motel 6 Locations.**

75.    G6 Defendants directly owned and controlled, and did not franchise, all of the subject Motel 6 properties for part or all of the time Jane Doe 1 was trafficked there except the Motel 6 in Manteca, California.

///

21

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

///

76.    For a portion of the time Jane Doe 1 was trafficked at the Motel 6 in Modesto California and the Motel 6 in Turlock, California, G6 Defendants franchised the properties and sold them to entities owned by Amandeep Dhillon and Jagmohan Dhillon.  During all periods that these motels and the Motel in Manteca, California were franchised, G6 Defendants controlled many day-to-day operations, benefitted from the room rentals, and knew that trafficking was occurring at the motels when Jane Doe 1 was trafficked there.

77.    G6 Defendants are vicariously liable for the acts, omissions, and knowledge of their Motel 6 Location Defendants and staff of the Motel 6 Location Defendants named herein, which are the G6 Defendants' actual agents or subagents.

78.    Upon information and belief, it is a standard practice in the hospitality industry, followed by all Defendants, for Parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that are placed on the beds, to the décor, to the types of payments accepted, to procedures followed in response to crime, to when, where, and how guests are greeted.

79.    G6 Defendants provide their Motel 6 Location Defendants with signage on and in front of the building. This is done to assure customers that when they check in, they can expect an experience consistent with the standards of the Parent Hotel Brand. This brand logo is displayed on everything in the motel, such as pens and paper on the bedside table and staff uniforms worn at the front desk during check-in.

80.    G6 Defendants provide their hotel branded locations brand name recognition, a marketing campaign, and motel listings in the Global Distribution System and other online agency databases. They also provide access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

loyalty programs, internal risk analyses, internal incident reporting processes, and company websites. Therefore, bookings, room reservations, and incidents that create liability risk, are primarily controlled by G6 Defendants.[29]

81.    G6 Defendants subject Motel 6 Location Defendants to detailed standards and requirements regarding the operation of the Motel 6 locations named herein through the franchising agreements, detailed written policies and manuals and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by the G6 Defendants.

82.    Upon information and belief, G6 Defendants require their branded Motel 6 Location Defendants' properties to use a property management system. This system is linked to the G6 Defendants' corporate network and data center. This is to, among other things, receive reservations, all related customer data, and process payment transactions. G6 has the data for each of its Motel 6 locations. G6 has the incident reports, including and especially related to police activity, calls for service, warrants, and surveillance footage pulled for law enforcement.

83.    Upon information and belief, per the relevant franchise agreements, G6 Defendants may enforce their brand standards through periodic inspections of the motel locations, backed up with the ultimate threat of termination of the agreement.[30]    G6 Defendants keep regional managers and other employees responsible for overseeing their franchised properties and are well aware of what is going on at each franchised property, and were aware at all relevant times alleged herein.

**Motel 6 Location Defendants Acted as Actual Agents of G6 Defendants.**

84.    G6 Defendants are vicariously liable for the acts, omissions, and knowledge of their Motel 6 locations, their staff, and staff of all of the locations

---

[29] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), The Origins and Growth of Franchising in the Hotel Industry (lodgingmagazine.com).
[30] Many of the franchise disclosure documents, which outline the policies and procedures of franchise agreements can be accessed publicly on https://fddexchange.com/view-fdd-docs.

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

named herein, which are G6 Defendants' actual agents or subagents, including employees.

85.     G6 Defendants subjected the Motel 6 locations named herein and the owners to detailed standards and requirements regarding the operation of the Motel 6 locations named herein through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by the G6 Defendants.

86.     Upon information and belief, at all times relevant herein, Defendants, and each of them, were the apparent ostensible principals, principals, apparent ostensible agents, agents, apparent ostensible servants, servants, apparent ostensible staff, staff, apparent ostensible assistants, assistants, apparent ostensible consultants, and consultants of their co-defendants and were acting as such within the course, scope and authority of said agency and employment, and that each of the Defendants, as aforesaid, when acting as a principal or agent, was negligent, including but not limited to, in the hiring, training, retention, and supervision of each and every other Defendant as an agent, servant, employee, assistant, and consultant.

87.     Upon information and belief, every act or omission of the Defendants and their apparent ostensible principals, principals, apparent ostensible agents, agents, apparent ostensible servants, servants, apparent ostensible staff, staff, apparent ostensible assistants, assistants, apparent ostensible consultants, and consultants of their co-defendants, whether or not within the scope of their agency, was ratified by the other remaining defendants.

88.     G6 Defendants obscure the full extent of control they exercise over their Motel 6 Franchisee locations and individual locations by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals.

89.     Upon information and belief, the standards that G6 Defendants

imposed on the Motel 6 Location Defendants:

 a. Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Motel 6 Defendants used at their Motel 6 locations;

 b. Covered virtually all aspects of hotel operations, including internal operating functions;

 c. Dictated the specific manner in which Motel 6 Location Defendants and hotel staff must carry out most day-to-day functions at their Motel 6 locations; and

 d. Significantly exceeded what was necessary for G6 Defendants to protect its registered trademarks.

90. G6 Defendants were in an agency relationship with the Motel 6 Location Defendants. Upon information and belief, this agency relationship was created through G6 Defendants exercise of an ongoing and systemic right of control over Motel 6 Location Defendants, including the means and methods of how Motel 6 Location Defendants conducted daily business through one or more of the following:

 a. Sharing profits;

 b. Requiring Motel 6 Location Defendants to use Motel 6's customer rewards program;

 c. Hosting online bookings on G6 Defendant's and Motel 6's developed, owned, and operated domain;

 d. Regulating internet access for guests;

 e. Setting employee wages;

 f. Making decisions about employment and budgets, including for security and management;

 g. Advertising for management and local positions;

 h. Standardized training and methods for Motel 6 Location

25

PLAINTIFFS' SECOND AMENDED COMPLAINT

Defendants staff;

i. Standardized or strict rules of operation;

j. Oversight in hiring and/or terminating staff and managers;

k. Building and maintaining the Motel 6 Location Defendants properties;

l. Fixing prices; and/or

m. Creating advertising campaigns and unrealistic expectations of safety for guests.

91.    G6 Defendants held the Motel 6 Location Defendants properties to the public as possessing authority to act on their behalf.

92.    In addition to the ways described above, upon information and belief, G6 Defendants exercised and reserved the right to exercise systemic and pervasive control over Motel 6 Location Defendants day-to-day operation of the subject Motel 6 locations named herein, including the following ways:

a. G6 Defendants required Motel 6 Location Defendants and management of Motel 6 Location Defendants to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for G6 Defendants to protect their registered trademarks;

b. G6 Defendants provided training for hotel management and select hotel staff on-site at the Motel 6 locations selected by G6 Defendants;

c. G6 Defendants required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d. G6 Defendants controlled training provided by Motel 6 Location Defendants to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training

26

methods used;

e. G6 Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that Motel 6 Location Defendants were required to purchase to operate the Motel 6 locations named herein, G6 Defendants designated approved vendors and prohibited the locations from purchasing goods and services from anyone other than an approved vendor;

g. G6 Defendants required Motel 6 Location Defendants to sign a technology agreement governing the terms under which they must procure and use technical services and software while operating the Motel 6 locations named herein. Motel 6 Location Defendants were required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h. G6 Defendants set required staffing levels for the Motel 6 locations named herein;

i. G6 Defendants established detailed job descriptions for all positions in its Motel 6 locations and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. G6 Defendants set requirements for the hiring process used by the Motel 6 Locations named herein and oversaw employee discipline processes and termination decisions;

k. G6 Defendants provided benefits for staff of the Motel 6 Location Defendants;

l. G6 Defendants required the Motel 6 Location Defendants to use a customer resource management program maintained and operated by

27

the G6 Defendants;

m. G6 Defendants controlled channels for guests to report complaints or provide feedback regarding the Motel 6 locations and directly participated in the response and/or supervised the response to customer complaints or other feedback. G6 Defendants retained the right to provide refunds or other compensation to guests and to require Motel 6 Location Defendants to pay associated costs;

n. G6 Defendants generated reports and analysis of guest complaints and online reviews for the subject Motel 6 locations;

o. G6 Defendants required the Motel 6 Location Defendants to use a Guest Relations Application owned, operated, and maintained by G6 Defendants to manage all guest data and information. G6 Defendants could use the backend of this system to analyze data and generate reports;

p. G6 Defendants set detailed requirements for insurance that the Motel 6 Location Defendants must purchase and retain the right to purchase insurance for the Motel 6 Location Defendants and to bill them directly for that insurance if G6 Defendants determine that they have not purchased adequate insurance;

q. G6 Defendants regularly audited the books and records of Motel 6 Location Defendants;

r. G6 Defendants conducted frequent and unscheduled inspections of Motel 6 locations, including the Motel 6 locations named herein;

s. G6 Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of any agreements if the Motel 6 Location Defendants violated any of the G6 Defendants' detailed rules, expectations, protocols, or policies,

including those that governed day-to-day operations of the Motel 6 locations named herein;

t. G6 Defendants controlled all marketing for subject Motel 6 locations and prohibited them from maintaining any online presence unless specifically reviewed and approved by the G6 Defendants;

u. G6 Defendants imposed detailed recordkeeping and reporting requirements on Motel 6 Location Defendants regarding virtually all aspects of hotel operations;

v. G6 Defendants supervised and controlled day-to-day operations of the Motel 6 locations named herein through detailed information and extensive reports that it obtained through the property management system and other software systems it required the Motel 6 Location Defendants to use; and

w. G6 Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

**G6 Defendants Knowingly Benefited from Participation in a Venture with the Motel 6 Location Defendants and Jane Doe 1's Traffickers.**

93.    G6 Defendants own locations and lend their name and likeness to third party owners, while the building and operations are under the brands' supervision and control. This is done through brand standards, franchise agreements, and maintaining control over all aspects of operations. This allows the parent brand to exchange the high risk that is inherent in owning an asset like a motel for the low risk associated with owning a property contract or franchise contract and still profit. Because of this, the motel locations and parent brands are inextricably intertwined. Here, Motel 6 Hotel Location Defendants and G6 Defendants are inextricably intertwined.

///

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

///

94.    Additionally, the following Motel 6® locations were directly owned and operated by a G6 Defendant Entity, G6 Hospitality Property, LLC so they are even more intertwined since G6 Defendants essentially all operate together and share the same information, data, profits, revenue and are controlled by the same individual people:

- Motel 6, located at 1433 Calle Joaquin San Luis Obispo, CA 93405;
- Motel 6, located at 1920 W Orangeburg Ave. Modesto, CA 95350;
- Motel 6, located at 1250 Twin View Blvd. Redding, CA 96003;
- Motel 6, located at 250 S. Walnut Rd Turlock, CA 95380; and

95.    The average customer does not see the franchisor/franchisee relationship. The parent brand gives the franchisee or individual property its identity. The parent brand provides the signage that assures customers that if they check into that hotel they can expect the standards consistent with the parent brand. The motel 6s are advertised as motel 6s, not a motel owned by anyone other than G6. The G6 Defendants hold themselves out to the public as the owners of the properties. Brand requirements and rules are contractual with the power to control weighed heavily toward the corporate parent brand. The Brand, here G6 Defendants, retain control over the properties.

96.    At all times of trafficking alleged herein and currently, booking and room reservations are controlled by the corporate parent brands, the G6 Defendants.

97.    Upon information and belief, at all times of trafficking alleged herein and currently, the franchised Motel 6 Location Defendants typically pay and paid a percentage of their total revenue back to the G6 Defendants and is required to develop and maintain the property in accordance with the parent brand G6 Defendants' standards as they are laid out in the franchise agreements.  G6 retains the right of entry and inspection, response to crime, response to trafficking, and

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

trainings related to the same.

98.    Upon information and belief, per the agreements, the G6 Defendants may enforce standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate, unsafe, or operating in violation of any laws. The right of the G6 Defendants to enforce their brand standards, including safety standards, is not just their right but their responsibility. Here, G6 Defendants did have employees in charge of inspecting and that did inspect the properties at relevant times when plaintiff was being trafficked there and who did see all of the red flags of Jane Doe 1 being trafficked and who knew or should have known that she, as well as several others, were indeed being trafficked for sex for long periods of time at their Motel 6 locations.

99.    At all times of trafficking alleged herein, G6 Defendants dictated franchisee policies related to safety, security, human trafficking, employee training and franchisee's response. As to the properties they owned, they dictated every single aspect of day to day operation and are directly responsible for their employees, managers, supervisors, regional managers, officers, directors and agents conduct in knowingly facilitating, aiding, abetting, and allowing trafficking to occur at the subject Motel 6 locations for profit.

100.    Upon information and belief, at all times of trafficking alleged herein, reservation information for rooms at the subject motels passed through a system operated and managed by the G6 Defendants.

101.    Defendants profited from the sex trafficking of Jane Doe 1 when they rented rooms to Jane Doe 1 and/or her trafficker when they knew or should have known that human trafficking was occurring due to several red flags being apparent and visible.

102.    Defendants benefited from the steady stream of income that Jane Doe 1's trafficker, and many other traffickers, brought to their motels and motel brands. Defendants profited from each and every room that Jane Doe 1's trafficker rented

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

where Jane Doe 1 was harbored and maintained for the purpose of sex trafficking.

103. Defendants facilitated the trafficking through its practices, policies, and procedures. They failed to take appropriate action to prevent the trafficking of individuals, including Jane Doe 1, for sex so they could continue to profit from the room rentals, and business that trafficking brings. They accommodated Jane Doe 1's trafficker's requests, allowed cash payments for extended periods, allowed men to parade in and out despite not being guests, allowed money exchanges to take place in front of them, and watched and heard physical abuse and rape occurring daily while Jane Doe 1 was trafficked at each property for long periods of time regularly.

104. G6 Defendants and Motel 6 Location Defendants owned and operated the subject locations while buyers paraded in and out of rooms rented for the purpose of trafficking Jane Doe 1. Their staff and agents observed and should have observed the buyers parading in and out of its hotel rooms to engage in the sex trafficking of Jane Doe 1. Their staff and agents observed or should have observed the trafficking occurring regularly and for multiple days at a time at the subject hotel locations but allowed it so they could profit.

105. Jane Doe 1's trafficking at the subject hotel locations was a result of G6 Defendants and Motel 6 Location Defendants participation in a venture with each other as well as Jane Doe 1's criminal trafficker. If G6 Defendants and Motel 6 Location Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe 1's trafficking at the subject hotel locations and Jane Doe 1 would not have suffered the harm that she did there.

106. Despite its actual or constructive knowledge that the venture it was engaged in was in violation of 18 U.S.C. §§1591(a) and 1595(a) through the conduct of motel staff and the widespread trafficking at the subject motel locations named herein, G6 Defendants participated in the venture by continuing to associate with

2:25-cv-03142-DC-JDP

the motel staff and with other Motel 6 Location Defendants to operate the hotel locations named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. § 1591(a) including trafficking of victims like Jane Doe 1.

107.    G6 Defendants and Motel 6 Location Defendants financially benefited from renting rooms to Jane Doe 1 and Jane Doe 1's trafficker on numerous occasions since they benefited each day that Jane Doe 1 was forced to engage in commercial sex at each of the Motel 6 locations for years.

108.    G6 Defendants participated in this venture through the conduct described herein as they were jointly responsible for relevant aspects of motel operations at the subject motel locations.

**Defendants Knowledge of Sex Trafficking at Their Locations.**

109.    Defendants' knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Defendants have known, since well before Jane Doe 1's trafficking, that sex trafficking was ongoing and widespread at their Motel 6 locations, including the subject locations named herein.

110.    Use of the G6 Defendants' branded properties for sex trafficking is well known to Defendants. Upon information and belief, before and at the time Jane Doe 1 was trafficked at the subject properties, each of the Motel 6 Location Defendants and/or G6 Defendants monitored criminal activity occurring at the branded hotels and were aware of activity indicating commercial sex, sex trafficking, and related crimes occurring at those branded motels, including the specific motel properties where Jane Doe 1 was trafficked.

111.    Defendants knew staff at the subject Motel 6 properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their brand properties, including but not limited to choosing not to implement policies and procedures known to be necessary to stop known trafficking; not requiring identification cards or "IDs"; allowing daily

33

payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms victims were trafficked without ID; ignoring yelling and screaming from rooms where trafficking took place; ignoring obvious copious amounts of sex paraphernalia; not addressing the trafficking signs and reports of drugs, abuse and prostitution; forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking or taking any steps to prevent or stop it.

112.    Defendants have access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking at the subject locations and at nearly all Motel 6 locations.

113.    Information that has become public through news stories establishes the entrenched and pervasive nature of Defendants' role in providing a venue where sex trafficking has continued unabated for years. Defendants have provided the means necessary for traffickers to traffic victims, including Jane Doe 1.

114.    During the period Jane Doe 1 was trafficked at the subject locations named herein, there were obvious signs that her trafficker was engaged in sex trafficking. In the summer of 2020, there were obvious signs that Jane Doe 1 was also pregnant.

115.    Other girls were trafficked at the same motels at the same time as Jane Doe 1 and that was obvious to Defendants.

116.    Jane Doe 1's trafficker was often present with Jane Doe 1 at check in and would linger around the hotel or in the parking lot while Jane Doe 1 was forced to have sex with customers at the subject motels. This was all in plain sight of Defendants' employees at the subject locations. Jane Doe 1's trafficker could be seen

leaving the room when another male arrived and then returning as soon as that male left. This would happen multiple times a day for extended periods that Jane Doe 1 was trafficked at Defendants' properties for years.

117.    There was heavy foot traffic in and out of the rooms where Jane Doe 1 was being harbored. This foot traffic involved men who were not motel guests. Several men came in and out of the subject hotel rooms in a single day. These individuals entered and left at unusual hours and were present at the motel for brief periods of time. Their comings and goings were visible to motel employees that were located at front desks and around the property. A reasonable motel would have seen these regular "red flag" interactions at their property in plain sight and Defendants should have seen it and did see it by and

through their employees and agents.

118.    There were obvious signs of trafficking consistent with sex trafficking, and which included well known "red flags" for trafficking in a motel, such as condoms, sex paraphernalia, and lingerie. These things were not only visible to but must have been seen by motel employees entering and cleaning the rooms or even just collecting the trash.

119.    When forced and coerced into coming and going from the subject motel locations, Jane Doe 1 looked unhealthy, unhappy, abused, and scared. Her trafficker and/or associates were always watching her, and her noticeable demeanor was visible to hotel employees they passed by.

120.    Upon information and belief, multiple employees at the subject hotel locations named herein, including management-level employees, observed, or were made aware of these obvious signs of Jane Doe 1's trafficking while acting within the scope and course of their employment.

121.    As such, Defendants knew and should have known that Jane Doe 1 was being trafficked at the subject motel locations named herein.

///

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

///

122.    A brief examination of just a handful of examples shows the extraordinary frequency with which Defendants have long received and continue to receive evidence and reports that human trafficking is a known issue at their hotel locations.

## G6 Defendants and Motel 6 Location Defendants Knowledge of Sex Trafficking at Motel 6 Locations.

123.    A Los Angeles Motel 6® became such a hub for human trafficking and other criminal activity that G6 Defendants paid to settle a public nuisance lawsuit related to such trafficking filed by the City of Los Angeles.[31]

124.    The Los Angeles nuisance settlement required G6 Defendants' to change policies that were facilitating sex trafficking.[32] G6 Defendants knew from that lawsuit, from many prior lawsuits, from reports from their branded locations and from their personal knowledge about sex trafficking at their locations that their policies were facilitating sex trafficking. Based on information and belief, at all times relevant in this Complaint and currently, G6 Defendants' have failed to adequately implement and enforce such changes.

125.    Public statements of G6 Defendants' confirm that they knew before and during the sex trafficking of Jane Doe 1 that sex trafficking is a problem in the hotel industry, sex trafficking was occurring at their branded hotels, and that they retained control over the response of their branded hotels to this problem. G6 Defendants recognized that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[33] They also acknowledged the significant role G6 Defendants' have in the three D's: deterring,

---

[31] Motel 6 pays $250,000 to settle human trafficking suit (Aug. 31, 2017), https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/.

[32] Id.

[33] G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf

36

detecting, and disrupting sex trafficking in their branded hotels.[34]

126.    G6 Defendants acknowledge on its website that it controls the policies, procedures, training, and codes of conduct that have facilitated sex trafficking at its Motel 6 Brand hotels, including the subject Motel 6 Defendant locations where Jane Doe 1 was trafficked and abused.[35]

127.    G6 Defendants' claim to take a zero policy against sex trafficking at its Motel 6 Brand locations, but G6 Defendants intentionally ensure its hotels are "strategically located . . . close to airports, freeways, and other thoroughfares" making them attractive venues for trafficking and compelled prostitution.[36]   For years, G6 Defendants' have chosen to place their branded locations, including the subject locations, in known trafficking areas/hubs.   They have scouts that specifically choose these locations after gathering data regarding the crime and trafficking rates in the area as part of a larger analysis.  G6 Defendants then weigh their risk and knowingly choose to put their branded motels on or near "the blade" or streets specifically known for commercial sex and sex trafficking.

128.    At the time of the trafficking alleged herein and currently, G6 Defendants' policies and procedures also provides the means for sex trafficking to harbor victims by providing low-rate rooms, accepting cash as payment, relaxed identification policies, not requiring IDs for persons entering and exiting the hotel, not providing adequate security, and providing multiple room keys for a single person.

129.    Upon information and belief, before and at the time Jane Doe 1 was trafficked at the subject Motel 6 locations, each of the Motel 6 Location Defendants monitored criminal activity occurring at G6 branded hotels and were aware of activity indicating commercial sex, sex trafficking and related crimes occurring at

---

[34] *Id.*

[35] https://g6hospitality.com/combating-human-trafficking/

[36] Motel 6 – An Iconic American Brand, https://g6hospitality.com/our-brands/#about-motel-six (last visited March 27, 2024).

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

those branded hotels, including the specific hotel locations where Jane Doe 1 was trafficked.

130.    Scores of news stories from across the United States highlight G6 Defendants' facilitation of sex trafficking and certainly establish that G6 Defendants' and Motel 6 Location Defendants knew, or should have known, of the use of Motel 6 hotels, including the subject hotels, for sex trafficking.

131.    Information that has become public through news stories establishes the entrenched and pervasive nature of G6 Defendants' and Motel 6 Location Defendants role in providing a venue where sex trafficking has continued unabated for years. Defendants have provided the means necessary for traffickers to traffic victims, including Jane Doe 1. Among notable press involving the frequent use of Motel 6 hotels for illegal trafficking activity, the following was noted:

    a.  In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten (10) times per day.[37]

    b.  In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[38]

    c.  In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[39]

    d.  From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[40]

[37] Amy Fine Collins, Sex Trafficking of Americans: The Girls Next Door, Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105

[38] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[39] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

[40] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download.

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

e.  Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[41]

f.  The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[42]

g.  The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[43]

h.  Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[44]

i.  In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[45]

j.  Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[46]

k.  Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[47]

l.  In the summer of 2015, a woman was arrested at a Motel 6 in Great

---

[41] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.

[42] FBI Investigates Human Trafficking At Madison Hotel, WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

[43] Suspects Busted in Anaheim Sex Ring, ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

[44] Lindsay Bramson, Local Teen Saved from Sex Slavery; Two Charged, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

[45] Amanda Milkovits, Massachusetts Man Accused of Trafficking Teen In Warwick Motel, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

[46] Sarah Kaplan, Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police, The Washington Post (Apr. 28, 2015)https://www.washingpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/?utm_term=.a804ce3f32a8.

[47] Hsing Tseng, Seven Indicted by Colorado Grand Jury In Child Sex Trafficking Ring Bust, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex- trafficking-ring-bust/.

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[48]

m. A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[49]

n. In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[50]

o. In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[51]

p. In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[52]

q. Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[53]

r. In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[54]

132. Ultimately, at least several hundred traffickers involved with hundreds to thousands of victims have been prosecuted by state and federal law enforcement

[48] Andrea Fisher, Woman Caught Up In Human Trafficking Ring Pleads Guilty (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads-guilty/89566374/.

[49] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, Herald Net (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[50] Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen, News Mississippi (Nov. 7, 28 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.

[51] Matt Fountain, Four Accused Of Pimping Out 15-Year-Old Girl In SLO Will Stand Trial, SanLuisObispo.com (May 5, 2016), https://www.sanluisobispo.com/news/local/article75832962.html.

[52] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex- traffickers-inhumanity/.

[53] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

[54] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

agencies for sex trafficking and forced prostitution out of G6 branded locations owned and controlled by G6 Defendants.

///

133. This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe 1 was trafficked at the subject properties, G6 Defendants and Motel 6 Location Defendants knew or should have known that:

    a. There was widespread and ongoing sex trafficking occurring at the G6 branded properties;

    b. Sex trafficking was a brand-wide problem for G6 Defendants;

    c. G6 franchisees and G6's own motel staff were not taking reasonable steps to identify, intervene, prevent and respond to known or probable sex trafficking occurring at their motel properties and were facilitating sex trafficking and harboring trafficking victims at the branded motel properties; and

    d. G6 and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

134. G6 Defendants and Motel 6 Location Defendants were specifically aware that sex trafficking was widespread and ongoing at the subject Motel 6 locations.

135. Internet reviews for the subject Motel 6 locations named herein, which G6 Defendants and Motel 6 Location Defendants managed, controlled, responded to and monitored, show the pervasiveness of sex trafficking before and after Jane Doe 1 was trafficked. Here are just a few examples:

    a. Motel 6 located, at 1433 Calle San Joaquin, San Luis Obispo, CA 93405

        o August 2011 review "…This one has somewhat transient Megan's law registrants."

        o Google 2020 review "…When I took my dog to go to the

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

bathroom I saw a tweeker getting banged out by some dude and what I think was the laundry area."

b.  Motel 6 located, at 1920 W Orangeburg Ave, Modesto, CA 95350

- o  Google review 2020 "There are underage human trafficking everyday. Police needs to investigate this Motel on a daily basis…They need to get respectful housekeeping at this Motel. Seriously… They also know there are underage human trafficking at this place."
- o  June 2020 "Horrible! Druggies and drug dealers everywhere. Prostitution. Noisy as hell. Front desk does nothing about complaints."

c.  Motel 6 located, at 250 S. Wanut Rd. Turlock, CA 95380

- o  September 2013 "…They rent rooms out by the hour clearly to druggies and prostitutes and they are not cleaned right."
- o  June 2016  "…But why leave the hotel when there are prostitutes and drug dealers for all of your entertainment needs."
- o  August 2016 "…tweekers and prostitutes kept me up all night. Coming and going at the room next to our and the room upstairs."

d.  Motel 6 located, at 150 Northwoods Ave., Manteca, CA 95336

- o  December 2020 "Pretty sure this was a hotel for prostitutes and drug deals gone bad. The room next to me had a hooker that was suffering from an overdose and screaming like she was on fire until 2 in the morning."
- o  January 2020 "Price was ok if you don't mind noise, fights, barking dogs and hookers."
- o  November 2024 "There was a condom on the ground in the

42

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

walkway outside my room and also a syringe left in the shower and front desk was notified and no one ever came to clean it up.

136. G6 Defendants and Motel 6 Location Defendants knew Jane Doe 1 was being trafficked at the locations named herein by the many red flags present during their continued stays. Jane Doe 1's trafficker paid for stays in cash, oftentimes was not required to present ID, paid for extended stays on a day-to-day basis, requested rooms away from other guest and/or the front desk, obvious signs of illegal drug use, obvious visible signs of physical abuse, do not disturb signs always up, frequent requests for new linens and towels but not letting cleaning staff into the rooms, men waiting out of the room while other men were inside with Jane Doe 1 for short periods of time.

137. The calls for service for law enforcement at each one of the Motel 6 locations named herein show just how much criminal activity was taking place at these specific locations. These calls for service include but are not limited to multiple calls for suspicious circumstances, prostitution, suspicious vehicles, domestic violence, battery, sexual assault, threats, disturbances, and welfare checks. These calls for service would have put Motel 6 Location Defendants as well as G6 Defendants on notice of the crimes occurring at their properties consistent with trafficking.

138. While at Motel 6 located at 150 Northwoods Ave. Manteca, CA 95336, Jane Doe 1 would often run from her trafficker through the hallways screaming. On several occasions the motel staff asked if she was okay and told her she needed to be less noisy but did not offer to help or do anything to prevent her trafficker from the continued abuse and capture. At this location, the owners lived on the property and knew Jane Doe 1's trafficker and many other traffickers that used their location for sex trafficking. This location was conveniently placed right next to the freeway, and many males went in and out of the motel seeking services.

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

139.    While at Motel 6 located at 250 S. Wanut Rd. Turlock, CA 95380 the owner was aware that Jane Doe 1 was being trafficked and approached her several times in suggestive ways like he wanted to participate.  Jane Doe 1 felt helpless and knew she could not tell the employees or ask them for help because they made it clear they knew her trafficker and would not help her.

140.    While at the Motel 6 located at 1920 W. Orangeburg Ave. Modesto CA 95350, the hotel staff and particularly an African American woman who worked the front desk held a very friendly relationship with Jane Doe 1's trafficker. She often let Jane Doe 1 and her trafficker sleep in the parking lot. The abuse that Jane Doe 1 was enduring would have been evident to the staff because he was aggressive with her in front of staff, she was not allowed to talk to anyone or make eye contact. Many other victims were being trafficked at this location at the same time as Jane Doe 1. Jane Doe 1 would often give money to her trafficker in the parking lot, where he waited after finishing with a buyer in the room. She would be constantly watched and abused at this location. It was at this same location where Jane Doe 1 had to be taken to the hospital to have an emergency c-section because her trafficker forced her to have commercial sex and was so abused so often while pregnant that she nearly lost her child, Jane Doe 2, and her life.

## **Defendants Participate in the Sex Trafficking Venture that Trafficked Jane Doe 1 where She is Forced and Coerced to Engage in Commercial Sex at Defendants' Properties.**

141.    Under false pretenses Jane Doe 1's trafficker initially fraudulently promised love and financial stability. She had no idea he was a trafficker. After her trafficker gained her trust and confidence, things quickly changed. Jane Doe 1's trafficker began to control her every move, control her identification, not let her have access to things to get help or away from him, beat her all the time, deprived her of basic needs, threatened her and her family constantly, and forced her to engage in commercial sex and follow any and all rules he set for her so that he and

PLAINTIFFS' SECOND AMENDED COMPLAINT

defendants could profit and benefit.  He drugged her and used weapons to control her.

///

142.   Jane Doe 1 was drugged, trapped and controlled with severe abuse, threats, physical force, weapons, manipulation, drug addiction, and coercion. Jane Doe 1 was trapped and was terrified of attempting to escape.

143.   From approximately July 2018 and through approximately August 2020, Jane Doe 1 was a victim of unlawful sex trafficking at the following locations:

  a.  Motel 6, located at 1433 Calle Joaquin, San Luis Obispo, CA 93405

  b.  Motel 6, located at 1920 W Orangeburg Ave, Modesto, CA 95350

  c.  Motel 6, located at 1250 Twin View Blvd, Redding, CA 96003

  d.  Motel 6, located at 250 S Walnut Rd, Turlock, CA 95380

  e.  Motel 6, located at 150 Northwoods Ave. Manteca, CA 95336

144.   For approximately two years, Plaintiffs trafficker rotated between these hotels consistently and regularly. These motels were used by Plaintiffs trafficker for weeks and months at a time encountering the same staff before switching to the next and continuing the cycle.  Motel 6 was her trafficker's motel of choice because they were known for trafficking, and he knew they would let him get away with it.

145.   Upon information and belief, the commonly accepted "red flags" of sex trafficking that Jane Doe 1 exhibited were open and obvious to the staff and management of the subject motels. The staff and management reported the "red flags" of trafficking at their subject locations to the Motel 6 Location Defendants and G6 Defendants, which directly placed them on knowledge and notice of Jane Doe 1's trafficking that was taking place on their owned, managed and controlled properties.

146.   While in the presence of the staff at the subject motel locations, Jane Doe 1's trafficker physically, mentally and emotionally abused her. All of the abuse

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

that Jane Doe 1 endured was apparent to the staff at the subject motel locations.

147. Jane Doe 1's trafficker used the same locations so often that the staff regularly recognized them.

148. Jane Doe 1's trafficker held a friendly relationship with the staff at the subject motels, and they were aware of his criminal acts. The staff often allowed Jane Doe 1's trafficker to retain the rooms he had reserved for extra time without payment while Jane Doe 1 was trafficked to pay for those rooms.

149. While in the presence of the staff at the subject motel locations, Jane Doe 1's trafficker physically, mentally and emotionally abused her. All of the abuse that Jane Doe 1 endured was apparent to the staff at the subject motel locations.

150. The motel locations named in this pleading are location in recognized trafficking areas and are well known as locations that regularly invite traffickers to use their rooms to traffic women like Jane Doe 1.

151. Motel 6 left the light on for Jane Doe 1's trafficker and several other traffickers and opened their doors to disgusting, inhumane abuse and sex trafficking so that they could reap the profits for room rentals.

152. Every day during the two years that Jane Doe 1 was trafficked at these motels – including during her pregnancy with Jane Doe 2 – the front desk and other staff at the subject motel locations assisted, supported, facilitated and engaged in numerous affirmative acts during their continuous and friendly business relationship with Jane Doe 1's trafficker.

153. Upon information and belief, while being trafficked at the subject motel locations, Jane Doe 1's trafficker held a friendly relationship with front desk staff. Jane Doe 1's trafficker was regularly allowed to wait in the parking lot while Jane Doe 1 would go back and forth between the parking lot and the rooms to engage in unlawful forced sex acts and then returning to the parking lot immediately after to hand off cash to her trafficker to avoid severe abuse, death or harm to her or her family.

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

154.    Upon information and belief, while being trafficked at the subject motel locations, when Jane Doe 1 was threatened or physically abused, if she could break away she would scream loudly and run through the hallways to get away. Motel 6 staff often approached her and warned her to be quiet. They didn't help and allowed her trafficker to take control of her, abuse her, and continue to force and coerce her.

155.    Upon information and belief, the motel staff at the subject locations who held a friendly relationship with Jane Doe 1's trafficker often warned Jane Doe 1's trafficker that the police were either on the way and/or looking for him. Jane Doe 1 heard him talk about their warnings and knew they warned him on certain occasions.

156.    During her trafficking period, Jane Doe 1 became pregnant with her daughter Jane Doe 1. Jane Doe 1's trafficker prohibited her from obtaining appropriate medical care during her entire pregnancy. Her trafficker forced her to engage in commercial sex acts during her entire pregnancy during which she would be manhandled, raped, and abused, and this occurred continually until the very day that she gave birth through an emergency c-section.

157.    Defendants were aware of her trafficking and it was visibly obvious to Motel 6 staff that she was pregnant during the last few months she was trafficked. After her trafficker forced her to perform commercial sex acts over 8 months into her pregnancy, Jane Doe was not allowed to seek care despite desperate pleas that Defendants heard or should have heard., Eventually, Jane Doe 1 had to be rushed to a hospital from one of the subject Motel 6 locations. An emergency C-section ultimately led to Jane Doe 1's escape from her trafficker.

158.    During the c-section, Jane Doe 1's daughter Jane Doe 2 almost died and was later diagnosed with cerebral palsy with incomplete quadriplegia. Jane Doe 2's diagnosis has and continues to require extensive medical treatment and ongoing care. Jane Doe 1 has had the responsibility to and has provided that constant care since Jane Doe 2's birth.

PLAINTIFFS' SECOND AMENDED COMPLAINT

159.    The Defendants in this case participated as active and willing accomplices to sex trafficking Jane Doe 1.

///

160.    Upon information and belief, the staff at the subject motel locations observed repeated signs of Jane Doe 1's trafficking but continued to rent out rooms to Jane Doe 1's trafficker.

161.    Upon information and belief, the staff at the subject motel locations observed and reported Jane Doe 1's trafficking to the Motel 6 Location Defendants who also observed and reported Jane Doe 1's trafficking to the G6 Defendants. Despite knowledge and notice all Defendants continued to rent out rooms to Jane Doe 1's trafficker despite knowing.

162.    Jane Doe 1 was forced to work long hours each night. The subject hotel locations regularly supplied excessive amounts of additional clean towels and bed sheets for Jane Doe 1's forced commercial sex acts.

163.    Jane Doe 1's trafficker used the subject motel locations to escort and force her to have sex with as many as eight or more buyers daily. She was forced to take every single buyer that requested services. Buyers would come and go from her motel room excessively without hotel staff intervention.

164.    For hours a day, Jane Doe 1's trafficker forced her to meet a quota by walking the parking lot and streets surrounding the subject motel locations while he watched.  Additionally, Jane Doe 1's trafficker advertised her on many different websites where he posted prices for her services ranging from $100 "quickies" to $300.

165.    While walking the streets, Jane Doe 1's trafficker observed from the subject hotels' parking lots and drove around and observed her every move so much so that the Motel 6 staff recognized his vehicle and could have recognized the illegal activity he was engaging in. Jane Doe 1's trafficker continued this routine over and over again for long hours and day after day at the subject motel locations.

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

166. Jane Doe 1's trafficker forced her and required that she make at least $800 per day from engaging in commercial sex acts otherwise her trafficker severely punished her by beating her, starving her or not allowing her to sleep.

167. The staff at the subject motel locations supported the illegal activity of Jane Doe 1's trafficker such that Jane Doe 1 often collected as much as $2,500, while engaging in forced sex acts with buyers coming in and out of the rooms rented by the subject hotel locations.

168. Jane Doe 1's traffickers would often steal money from buyers online and then they would later show up with weapons and force Jane Doe 1 to engage in commercial sex with them, these aggressive interactions occurred while in the presence of the subject motel staff.

169. During her trafficking period, Jane Doe 1 appeared visibly malnourished and under distress, including while she was noticeably pregnant in 2020. During her trafficking she often was forced to "work" long hours with little sleep and as little as one meal per day.

170. Everyday Jane Doe 1 was forced to wear provocative clothing such as lingerie and high heels while walking in the subject motel's parking lot, hallways, breakfast areas, and laundry rooms.

171. The subject motel rooms that Jane Doe 1 was trafficked at had excessive amounts of cash, condoms, paraphernalia and drugs, which were visible to hotel staff from the hallways.

172. Jane Doe 1 was forced to keep her head down and not look at anyone in the eyes or interact with anyone. Although she was terrified of asking for help, it was apparent that Jane Doe 1 was being sex trafficked and abused when she would scream in her room and through the hallways many times trying to escape and/or defend herself from her trafficker's abuse.

173. The subject motel locations where Jane Doe 1 was harbored during her trafficking had visible and olfactory signs of illegal drug use and sale.

PLAINTIFFS' SECOND AMENDED COMPLAINT

174.    Jane Doe 1's trafficker regularly drugged her to force her to submit. The apparent signs of forced drug use would have also placed the staff at the motel locations on notice of Jane Doe 1's trafficking.

175.    Jane Doe 1 sustained permanent and disabling bodily injuries as a result of the abuse of her trafficker, including her emergency c-section and her daughter Jane Doe 2's diagnoses, including   cerebral palsy.

176.    Jane Doe 1 continues to suffer from mental and emotional health problems, which impact her life on a daily basis. It is foreseeable that Jane Doe 1 will suffer from the ill effects of her trafficking for the rest of her life.

177.    Jane Doe 2's diagnosis of cerebral palsy with quadriplegia was a direct and proximate result of the abuse Jane Doe 1 sustained at the hands of her trafficker and sex buyers. The fact that Jane Doe 1 was a pregnant woman in an obviously unsafe situation was foreseeable and known to Defendants' employees who knew she was trafficked at their properties repeatedly, including while she was pregnant, and witnessed that she was far along in her pregnancy.

178.    Defendants engaged in overt actions which were the direct and unimpeded causes of Jane Doe 1's trafficking at their motels and Jane Doe 1 and Jane Doe 2's resulting injuries.

179.    Each of the following "red flags" and/or signs of knowledge took place in the presence and observation of the subject motel staff:

- Jane Doe 1's trafficker obtained discounted hotel rooms.
- Jane Doe 1's trafficker paid for hotel rooms in cash.
- Jane Doe 1's trafficker requested back rooms and those with easy access to the back/side doors of the hotels.
- Jane Doe 1's trafficker rented hotel rooms for days at a time, encountering the same staff.
- Jane Doe 1's trafficker kept the 'Do Not Disturb' sign on the door at all times and would not let Jane Doe 1 answer the door if hotel staff

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

knocked.

- The Hotel rooms were occupied by people who did not book rooms and were not authorized guests.

- Arguments, fighting and yelling took place in the subject hotel rooms.

- Jane Doe 1's trafficker grabbed and pushed her to the ground at the subject hotel locations.

- The hotel staff would personally provide excessive towels and linen changes for Jane Doe 1's traffickers.

- Jane Doe 1's trafficker would wait for the housekeepers to come around to request more towels.

- Drug use and large amounts of cash were visible to hotel staff from the hallways.

- There were individuals frequently entering and leaving the room in which Jane Doe 1 was held.

- The rooms in which Jane Doe 1 was held smelled of body fluids and musk, which was evident from the public hallway.

- There were excessive amounts of drugs and foil in the room(s) in which Jane Doe 1 was held which was visible from the hallways.

- There were excessive amounts of sex paraphernalia in the room(s) in which Jane Doe 1 was held, including condoms and lubricant which were visible from the hallways and when the trash was changed and/or the rooms were cleaned.

- The Hotel staff stared at Jane Doe 1 in a judgmental manner.

- Jane Doe 1's trafficker appeared paranoid every night.

- Jane Doe 1 showed visible signs of intoxication and illegal drug use while walking through the hotel and encountering hotel staff.

- Jane Doe 1 showed signs of fear, anxiety, tension, submission and/or nervousness.

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

- Jane Doe 1 showed signs of physical abuse, restraint, and/or confinement.
- Jane Doe 1 showed signs of emotional abuse, and/or being treated in a demeaning way.
- Jane Doe 1 showed signs of malnourishment, poor hygiene, fatigue, sleep deprivation, injuries and/or unusual behavior.
- Jane Doe 1 avoided eye contact or interacting with others.
- Jane Doe 1 had no control over possession of money.
- Jane Doe 1 appeared distressed or injured due to being beaten and raped multiple times.
- Jane Doe 1 appeared in provocative clothing and shoes.
- Jane Doe 1 was forced to keep her head down and not make eye contact with anyone at the hotels.
- Jane Doe 1's trafficker controlled her decisions and conversations.
- Jane Doe 1 was visibly drugged by her trafficker while being transported and taken to and from the subject hotel rooms.
- Jane Doe 1 was often not coherent.
- Signs of physical, mental and emotional abuse were clearly visible to the hotel staff that saw her return again and again.
- Jane Doe 1 was visibly being abused and forced to have sex while noticeably pregnant; Defendants could have seen Jane Doe 2 was in Jane Doe 1's uterus.

180.    These red flags were open and obvious to anyone working at the subject motel locations and anyone inspecting the location and lasted for two years.

181.    Jane Doe 1's trafficking had profound effects on her, consistent with "red flags" of trafficking that are well recognized in the hospitality industry. These "red flags" include the visible effects on her appearance, demeanor, movements throughout the motel, her interactions with her trafficker, hotel staff, and others.

52

PLAINTIFFS' SECOND AMENDED COMPLAINT

Observing these effects provided Defendants with notice that Jane Doe 1 was being continuously subjected to coercion, control and exploitation, including while she was pregnant with Jane Doe 2.

182. Upon information and belief, these "red flags" were open and obvious to the staff and management of the subject hotels. The staff and management reported the "red flags" of trafficking at the subject locations to the Motel 6 Location Defendants and G6 Defendants directly placing them on knowledge and notice of Jane Doe 1's trafficking which was taking place on their owned, managed and controlled property.

**Motel 6 Location Defendants Facilitated Trafficking of Jane Doe 1**

183. Motel 6 Location Defendants had both actual and constructive knowledge of the trafficking of Jane Doe 1 at the motel locations they owned and operated because the trafficking was the direct result of Motel 6 Location Defendants facilitating her trafficking at the subject locations.

184. Motel 6 Location Defendants, and G6 Defendants, are responsible for the acts, omissions, and knowledge of all employees of the subject motel locations when operating the motels because these acts and omissions were committed in the course and scope of employment and every employee acted as an agent of Defendants. Motel 6 Location Defendants and G6 Defendants ratified the wrongful acts and omissions that was the participation in Jane Doe 1's sex trafficking because Defendants knew that it was happening, knew the employees were allowing it to happen, knew the employees were not trained and/or not following trainings, policies and/or procedures to stop it, and knew that Defendants were benefitting from their employees' participation in sex trafficking ventures through room rentals for the same.

185. Despite having actual and constructive knowledge of widespread and ongoing sex trafficking at the subject locations, Motel 6 Location Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

Jane Doe 1 and other victims.

///

///

186. Motel 6 Location Defendants knew or were willfully blind to the fact that Jane Doe 1 was being trafficked and, despite this, benefited from continued association with her trafficker by providing them with a venue in the form of hotel rooms and related services, to harbor and facilitate Jane Doe 1's sexual exploitation.

187. Defendants also facilitated widespread trafficking at their hotel locations, including the trafficking of Jane Doe 1 in ways including:

    a. Allowing inappropriate and inadequate practices for hiring, training, supervising, managing and disciplining front line staff regarding issues related to human trafficking;

    b. Inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

    c. Choosing not to report known or suspected criminal activity including

    sex trafficking according to reasonable practices, industry standards, laws, and/or applicable franchisor policies and procedures; and

    d. Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

### G6 Defendants Facilitated the Trafficking of Jane Doe 1

188. Upon information and belief, during the times Jane Doe 1 was trafficked at the subject properties, G6 Defendants participated directly in aspects of the operation of those subject motels, including the ones it owned the entire time

54

PLAINTIFFS' SECOND AMENDED COMPLAINT

and the ones that were franchised at any point, that influenced whether and to what extent trafficking occurred at the motels, including but not limited to the trafficking of Jane Doe 1, as follows:

a. G6 Defendants assumed responsibility and control over the human trafficking response of their subject motel properties, including design and implementation of practices to prevent trafficking, safety, and security procedures, employee, and franchisee education, training and response, partnership with external organizations, and advocacy;

b. G6 Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in their branded hotel locations;

c. G6 Defendants retained control over determining which hotels needed additional training or other resources on the risk of trafficking occurring and other related criminal activity;

d. G6 Defendants retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

e. G6 Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives it, and the consequences of someone not participating or failing to follow such training; and

f. G6 Defendants retained control over setting, supervision, overseeing, and enforcement policies and procedures for housekeeping services at the subject motel locations, including how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

189.    As a direct and proximate result of these egregious practices on the part of the G6 Defendants, Jane Doe 1 and victims of sex trafficking and exploitation have been permanently injured and damaged physically, emotionally, psychologically, and financially. G6 Defendants, together with these Motel 6 Location Defendants, provided multiple venues to Jane Doe 1's trafficker that aided and abetted his trafficking of her.  G6 Defendants have been displaying the same level of participation in the sex trafficking industry for decades.  It must stop.  They must be held accountable.

## Defendants are Jointly Responsible for the Trafficking of Jane Doe 1

190.    G6 Defendants and their subject Motel 6 Location Defendants were participants in a joint venture with each other, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

191.    Upon information and belief, the operation of the subject Motel 6 locations were part of a single unified operation by G6 Defendants. Upon information and belief, the subject Motel 6 locations shared common parent companies, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, G6 Defendants acted jointly to own, operate, control, manage, and supervise the subject Motel 6 locations. As an integrated enterprise and/or joint venture, G6 Defendants and Motel 6 Location Defendants were separately and jointly responsible for compliance with all applicable laws.

## Defendants are Responsible for Jane Doe 2's Injuries

192.    Defendants owed a duty of care to ensure the safety of their hotel guests, including Jane Doe 1 and Jane Doe 2.

193.    Defendants' staff, including managers, front desk workers, cleaning staff, security, and other employees at the subject Motel 6 locations witnessed Jane

56

PLAINTIFFS' SECOND AMENDED COMPLAINT

Doe 1's trafficking and knew or should have known she was in an unsafe situation while pregnant. The obvious danger Jane Doe 1 – and her unborn baby Jane Doe 2 – only grew while she was pregnant.

194. During the last months of Jane Doe 1's pregnancy, it was obvious and apparent to Motel 6 staff – who already knew or should have known she was being trafficked – that she was also visibly pregnant. It was also obvious and apparent that she was being beaten, raped, and abused by her trafficker and buyers during this time.

195. The likelihood of harm to her fetus Jane Doe 2 was foreseeable because Motel 6 staff knew that Jane Doe 1 was being subjected to severe physical violence while pregnant.

196. Despite the obvious and apparent risk to Jane Doe 1 and her unborn baby, Jane Doe 2, Defendants staff chose not to intervene or offer to help Jane Doe 1 escape. Instead, Defendants knowingly or recklessly chose to facilitate and accommodate Jane Doe 1's traffickers and to shield them from law enforcement. So, the trafficking, rape, assaults, and physical abuse of visibly pregnant Jane Doe 1 continued every night at the subject Motel 6 locations.

197. The violence ultimately led Jane Doe 1 to require an emergency c-section after being brutally raped by a buyer at one of the subject Motel 6 properties. Jane Doe 2 had several health issues as a result of the trauma from her mother being trafficked and abused at Defendants properties. She was diagnosed with cerebral palsy. Jane Doe 2 requires and will require complex and ongoing medical care for the rest of her life.

198. Physical violence and injuries sustained during pregnancy are linked to increased risk of the unborn fetus developing cerebral palsy, especially in the following circumstances: injuries are more severe; multiple injuries; when the injuries result in hospitalization; and when the baby is delivered shortly after the

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

injury.[55]

///

199. Physical violence and abuse that Jane Doe 1 and Jane Doe 2 experienced at Defendants' hotels was more likely than not the proximate cause of Jane Doe B suffering multiple health issues and injuries before and at birth, including but not limited to cerebral palsy with quadriplegia.

**Defendants are Jointly and Severally Liable for Plaintiffs Damages**

200. The venture or ventures in which each Defendants participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe 1.

201. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe 1 for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

202. Under a negligence theory, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe 1 and Jane Doe 2 for past and future losses she suffered as a proximate result of their injuries.

**CAUSES OF ACTION AGAINST ALL DEFENDANTS**

**Sex Trafficking under 18 U.S.C. § 1595**

(Jane Doe 1 against all Defendants)

**Cause of Action 1: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (All Defendants)**

203. Jane Doe 1 realleges and incorporates the allegations in paragraphs 1 through 187.

204. Jane Doe 1 is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

205. Defendants are perpetrators within the meaning of 18 U.S.C §1595(a)

---

[55] Ahmed et al., In Utero Exposure to Maternal Injury and the Associated Risk of Cerebral Palsy, 177 JAMA Pediatr. 53 (2023), https://doi.org/10.1001/jamapediatrics.2022.4535

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

because they:

a. Violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals, including Plaintiff, knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

b. Violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel locations.

206.    Violations of 18 U.S.C §1595(a) by each of the Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe 1 to suffer substantial physical and psychological injuries and other damages as a direct and proximate result of being trafficked and sexually exploited at the Defendants' motel locations.

**Cause of Action 2: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).**

207.    Jane Doe 1 realleges and incorporates the allegations in Paragraphs 1 through 191.

208.    Jane Doe 1 is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

209.    Through acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

other and traffickers, including Jane Doe 1's trafficker, despite the fact that each defendant knew or should have known that this trafficker was engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2) at Defendants' properties, including the subject locations alleged in this Complaint. As more specifically alleged above, G6 Defendants and Motel 6 Location Defendants took part in a common undertaking and enterprise involving risk and potential profits, and here, actual profits resulted. G6 Defendants' and Motel 6 Location Defendants' employees had a direct association with the trafficker and knowingly facilitated the trafficker, which, as shown more thoroughly in the incorporated allegations above, showed a continuous business relationship between the trafficker and Defendants such that the pattern of conduct appears to be a tacit agreement between them. Thus, Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

210. Through the acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each other in the operations of its respective hotel locations even though Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

211. Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe 1 to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel locations.

## Cause of Action 3: Vicarious Liability for TVPRA Violations
## (G6 Defendants)

212. Jane Doe 1 realleges and incorporates the allegations in Paragraphs 1 through 196.

213. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

joint venture.

214. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

///

215. Motel 6 Location Defendants acted as the actual agents of G6 Defendants when operating its respective motel locations and in committing the wrongful acts and inactions alleged herein.

216. Through the wrongful acts and omissions described throughout this Complaint, G6 Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisees to operate its respective motel properties; and as to the properties it directly owned and controlled, it did the same.

217. G6 Defendants are vicariously liable for the TVPRA violations of its franchisees, the Motel 6 Location Defendants, and the subagents of such.

218. Additionally, on information and belief, each of the G6 Defendants participated in a joint venture operating the subject Motel 6 locations when they owned, operated, and/or controlled each property during the trafficking period. They had highly integrated operations at the hotels, shared revenue and profits generated from the hotels, and exercised mutual control over the venture at the hotels. They functioned as a single integrated entity and/or as alter-egos of one another and are therefore each directly and proximately liable for the harms and damages caused to Jane Doe 1 as a result.

## Negligence

(Plaintiffs against all Defendants)

### Cause of Action 4: General Negligence

219. Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 218.

220. Defendants owed a duty of care to protect Plaintiffs Jane Doe 1 and

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

Jane Doe 2 from foreseeable risks from harm as hotel guests on their properties.[56]

221. Through the wrongful acts and omissions described throughout this Amended Complaint, Defendants employed staff to operate their Motel 6 properties, including but not limited to managers, front desk clerks, night auditors, housekeeping staff, security guards, and/or maintenance workers. Throughout the period Jane Doe 1 was trafficked, Defendants, their actual and/or apparent agents, and/or their employees witnessed the red flags of Jane Doe 1's trafficking and signs that Jane Doe 1 was in an unsafe, abusive trafficking situation – which included beatings, rapes, and sexual assaults – while she was visibly pregnant with Jane Doe 2.

222. Defendants repeatedly witnessed Jane Doe 1 obviously under the control of her trafficker while pregnant. Defendants' employees witnessed Jane Doe 1's trafficker physically abuse her in public areas of the subject Motel 6 locations and signs of physical abuse such as sounds of screaming and yelling coming from her room; bruising; scarring; black eyes; Jane Doe 1 attempting to run away and ask for help; and Jane Doe 1 appearing abused, malnourished, and scared. Defendants witnessed this both before and during Jane Doe 1's pregnancy, including up to when she was over 8 months pregnant and crying for help because she feared injuries to her baby.

223. Defendants breached their duty of care by acts, omissions, and commissions, including but not limited to the following:

    a. Failing to intervene or help Jane Doe 1 despite obvious signs she was regularly being beaten while pregnant and prior knowledge of physical violence for a year before her pregnancy;

    b. Failing to adequately train, supervise, and retain employees to

---

[56] *See* Cal. Civ. Code § 43.1 ("A child conceived, but not yet born, is deemed an existing person, so far as necessary for the child's interests in the event of the child's subsequent birth.").

ensure proper monitoring of surveillance cameras at their properties for signs of human trafficking, sexual exploitation, or physical abuse;

c. Failing to provide and/or train adequate security in their establishments and/or on their properties;

d. Failing to adequately train, supervise, and retain employees, to ensure proper monitoring of their establishment for signs of dangerous conditions;

e. Failing to adequately train, supervise, and retain employees, to ensure the investigation of suspicious behavior at their establishment and/or properties, which would have alerted the Defendants to the Plaintiffs' unsafe situation;

f. Failing to adequately train, supervise, and retain employees, to ensure proper reporting to law enforcement of signs of guest misconduct, violence, and crimes at their establishment and/or on their property; and

g. Failing to otherwise provide adequate security and take reasonable steps to protect Plaintiffs.

224. As a direct and proximate result of the Defendants' negligent acts, omissions, and/or commissions described above, Plaintiffs Jane Doe 1 and Jane Doe 2 were injured and harmed. Jane Doe 1 suffered serious and permanent physical, mental and emotional injuries in a sum that will be shown according to proof at trial. Jane Doe 2 suffered serious and permanent injuries, including but not limited to cerebral palsy, because of Jane Doe 1's repeated beatings, rapes, and assault by her traffickers and sex buyers while she was pregnant during her trafficking at the subject Motel 6 locations owned and/or controlled by Defendants. This physical violence was the proximate cause of Jane Doe 2's physical and permanent injuries, including but not limited to cerebral palsy with quadriplegia. Jane Doe 1 and Jane Doe 2 will suffer like injuries in the future, all in amounts currently unknown to

63

them, which shall be shown according to proof at trial.

225.    As a direct and proximate result of the Defendants' negligent acts and omissions, Plaintiff Jane Doe 2 has and will suffer every day due to her cerebral palsy and quadriplegia, and underwent and will undergo significant medical treatments for her injuries.

226.    Plaintiffs have suffered and will continue to suffer from injuries including, but not limited to, past and future conscious physical pain and mental anguish, past and future pain and suffering, and economic loss in the past, present and future, as a direct and proximate result of the Defendants' failures.

227.    Additionally, Plaintiffs have suffered and continue to suffer damages, including but not limited to, a lifetime loss of earnings, a diminution in earning capacity and medical expenses past and future, including the expenses that in reasonable probability will be incurred in the future, as a direct and proximate cause of the Defendants' negligence. Plaintiffs have also suffered and continue to suffer from injuries including, but not limited to, a loss of expected enjoyment of life and a permanent alteration of reasonable pre-injury life expectancy expectations.

228.    All injuries and damages, past, present, and future were a direct and proximate result of the negligent acts, omissions, and/or commissions of the Defendants, without any negligence or want of due care on the part of the Plaintiffs contributing thereto.

229.    At all times relevant, Defendants' negligent acts and omissions were a substantial factor in causing the injuries and damages to Plaintiffs at their properties and thereafter.

## Cause of Action 5: Negligent Hiring, Retention, Training, and Supervision

230.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 229.

231.    At all relevant times, Defendants owed a duty to exercise reasonable

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

care in the hiring, retention, training, and supervision of their employees, agents, and/or representatives so as to ensure the safety and well-being of its hotel guests, including Plaintiffs.

///

232. Defendants had a duty to implement and follow reasonable policies, procedures, and practices for screening, training, monitoring, and disciplining employees to prevent foreseeable harm to hotel guests like the Plaintiffs from being injured by others on their properties.

233. Defendants breached its duties by negligently hiring, retaining, training, and/or supervising Motel 6 employees that Defendant knew or, in the exercise of reasonable care, should have known was unfit, incompetent, and/or posed a foreseeable risk of harm to others, including Plaintiffs.

234. The unfitness and/or incompetence of Defendants' employees was known to Defendants or would have been discovered by Defendants through the exercise of reasonable care in hiring, training, supervision, investigation of complaints, inspection and/or disciplinary measures.

235. Defendant's negligent hiring, training, retention, and/or supervision was a substantial factor in causing Plaintiffs' harm.

236. Defendants breached their duty of care by acts, omissions, and commissions, including but not limited to the following:

  a. Failing to adequately train, supervise, and retain employees to recognize when a hotel guest, like Jane Doe A, is in an unsafe situation;

  b. Failing to adequately train, supervise, and retain employees on when and how to intervene to prevent danger to hotel guests, including but not limited to removing dangerous individuals from the property and involving law enforcement;

  c. Failing to adequately train, supervise, and retain employees to

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

ensure proper monitoring of surveillance cameras at their properties for signs of human trafficking, sexual exploitation, or physical abuse;

d. Failing to provide and/or train adequate security in their establishments and/or on their properties;

e. Failing to adequately train, supervise, and retain employees, to ensure proper monitoring of their establishment for signs of dangerous conditions;

f. Failing to adequately train, supervise, and retain employees, to ensure the investigation of suspicious behavior at their establishment and/or properties, which would have alerted the Defendants to the Plaintiffs' unsafe situation;

g. Failing to adequately train, supervise, and retain employees, to ensure proper reporting to law enforcement of signs of guest misconduct at their establishment and/or on their property; and

h. Failing to otherwise provide adequate security and take reasonable steps to protect Plaintiffs in the face of foreseeability, notice and knowledge of risk and harm to Plaintiffs at the properties.

237. Defendants' negligent hiring, retention, training, and/or supervision occurred within the course and scope of its business operations and created an undue risk of harm to foreseeable victims such as Plaintiffs.

238. As a direct and proximate result of the Defendants' negligent acts, omissions, and/or commissions described above, Plaintiffs Jane Doe 1 and Jane Doe 2 were injured and harmed. Jane Doe 1 suffered serious and permanent physical, mental and emotional injuries in a sum that will be shown according to proof at trial. Jane Doe 2 suffered serious and permanent injuries, including but not limited to cerebral palsy, because of Jane Doe 1's repeated beatings, rapes, and assault by her traffickers and sex buyers while she was pregnant during her trafficking at the subject Motel 6 locations owned and/or controlled by Defendants. This physical

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

violence was the proximate cause of Jane Doe 2's physical and permanent injuries, including but not limited to cerebral palsy with quadriplegia. Jane Doe 1 and Jane Doe 2 will suffer like injuries in the future, all in amounts currently unknown to them, which shall be shown according to proof at trial.

239. As a direct and proximate result of the Defendants' negligent acts and omissions, Plaintiff Jane Doe 2 has and will suffer every day due to her cerebral palsy and quadriplegia, and underwent and will undergo significant medical treatments for her injuries.

240. Plaintiffs have suffered and will continue to suffer from injuries including, but not limited to, past and future conscious physical pain and mental anguish, past and future pain and suffering, and economic loss in the past, present and future, as a direct and proximate result of the Defendants' failures.

241. Additionally, Plaintiffs have suffered and continue to suffer damages, including but not limited to, a lifetime loss of earnings, a diminution in earning capacity and medical expenses past and future, including the expenses that in reasonable probability will be incurred in the future, as a direct and proximate cause of the Defendants' negligence. Plaintiffs have also suffered and continue to suffer from injuries including, but not limited to, a loss of expected enjoyment of life and a permanent alteration of reasonable pre-injury life expectancy expectations.

242. All injuries and damages, past, present, and future were a direct and proximate result of the negligent acts, omissions, and/or commissions of the Defendants, without any negligence or want of due care on the part of the Plaintiffs contributing thereto.

243. At all times relevant, Defendants' negligent acts and omissions were a substantial factor in causing the injuries and damages to Plaintiffs at their properties and thereafter.

**JOINT AND SEVERAL LIABILITY**

244. "Joint and several liability 'applies when there has been a judgment

against multiple defendants."[57] If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the Plaintiffs recover only once for the full amount.[58]

245.    Federal and California law allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, without regard to his proportion of fault and even if the concurrent negligence of others contributed to the incident.[59]

Plaintiffs allege Defendants, and each of them, should be held joint and severally liable to Plaintiffs for the totality of her injuries and damages alleged herein.

## DAMAGES

246.    Defendants' wrongful acts and omissions described above, individually and collectively, caused Plaintiffs to sustain legal damages.

247.    Plaintiffs did suffer the following injuries as a direct and proximate result of Defendants', and each of their, wrongful actions and inactions alleged herein, and as such Plaintiffs are entitled to be compensated for past and future personal injuries, non-economic damages, and economic damages, see, e.g., 18 U.S.C. §§ 1593, 1595, including:

      a.  actual damages;

      b.  direct damages;

      c.  incidental and consequential damages;

      d.  lost earnings and lost earning capacity;

      e.  necessary medical expenses;

      f.  life care expenses;

      g.  physical pain and suffering;

---

[57] *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220–21 (1994).

[58] See 735 ILCS 5/2-1117; see Restatement (Second) of Torts § 875 (1977); *Honeycutt v. United States*, 137 S. Ct. 1626 (2017).

[59] *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) (citations omitted); *Manganiello v. City of New York*, No. 07 Civ. 3644, 2008 WL 2358922 (S.D.N.Y. June 10, 2008), affirmed, 612 F.3d 149 (2nd Cir. 2010).

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

h. physical impairment;

i. mental anguish and emotional distress damages (until trial and in the future);

j. restitution;

k. unjust enrichment; and

l. disgorgement of profits.

248. Plaintiffs are entitled to pre- and post-judgment interest at the maximum legal rates.

## PUNITIVE DAMAGES

249. Plaintiffs are entitled to punitive damages under the applicable statutes and common law against Defendants, and each of them, for each and every cause of action alleged herein, as a result of Defendants' outrageous, wanton, willful, and malicious conduct underlying Jane Doe 1's claims. See *Ditullio v. Boehm*, 662 F.3d 1091 (9th Cir. 2011).

## COSTS AND ATTORNEY FEES

250. Plaintiffs are entitled to recover costs and reasonable, necessary, or customary attorneys' fees from Defendants under common law and applicable statutes. See 18 U.S.C. § 1595(a).

251. All conditions precedent to Plaintiffs' recovery of its costs and attorneys' fees have occurred or will occur prior to entry of judgment in this suit.

## JURY DEMAND

252. Plaintiffs request a jury trial in this action.

## PRAYER

For these reasons, Plaintiffs respectfully pray that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiffs against Defendants jointly and severally, for:

a. all economic damages to which they are entitled;

b. all actual damages to which they are entitled;

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT

c.  all incidental and consequential damages to which she is entitled;

d.  all mental anguish and emotional distress damages to which they are entitled;

e.  all restitution damages to which they are entitled;

f.  all disgorgement of profits to which they are entitled;

g.  all unjust enrichment damages to which they are entitled;

h.  exemplary, treble, and/or punitive damages;

i.  attorneys' fees and costs of suit;

j.  pre-judgment and post-judgment interest at the highest rate allowed by law; and

k.  all other relief to which she is entitled in law or in equity.

SINGLETON SCHREIBER

Dated: May 27, 2026     /s/ Meagan Verschueren
Meagan Verschueren (SBN 313117)
Katie Llamas (SBN 303983)
Attorneys for Plaintiffs Jane Doe 1 and Jane Doe 2

## CERTIFICATE OF SERVICE

I hereby declare under penalty of perjury under the laws of the United States of America that on this date, the foregoing document was filed electronically with the Court and thus served simultaneously upon all counsel of record.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on June 16, 2026     /s/ Meagan Verschueren
Meagan Verschueren, Esq.
SINGLETON SCHREIBER

SINGLETON SCHREIBER

Dated: June 16, 2026     /s/ Meagan Verschueren
Meagan Verschueren (SBN 313117)
mverschueren@singletonschreiber.com
Katie Llamas (SBN 303983)
kllamas@singletonschreiber.com
591 Camino de la Reina, Ste. 1025
San Diego, CA 92108

70

2:25-cv-03142-DC-JDP
PLAINTIFFS' SECOND AMENDED COMPLAINT

Tel. (619) 771-3473
Attorneys for Plaintiffs Jane Doe 1 and Jane
Doe 2

2:25-cv-03142-DC-JDP

PLAINTIFFS' SECOND AMENDED COMPLAINT